IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN KIGHT** | : | |
| **Plaintiff** | : | **Civil Action:** 1:24-cv-51 |
| | : | |
| **V.** | : | |
| | : | **No.:** |
| **KONINKLIJKE PHILIPS, N.V.  PHILIPS** | : | |
| **NORTH AMERICAN, LLC AND PHILIPS** | : | |
| **RS NORTH AMERICAN LLC.,** | : | |
| **Defendant** | : | |

## COMPLAINT

Plaintiff, John Kight, individually and on behalf of all others similarly situated, by and through his attorneys, alleges as follows and makes no objection to the Western District Court sua sponte ordering this case to be jointed with other cases designated as "class action lawsuit" for the personal injury and damages allegedly caused by the above-named defendants:

### I.    NATURE OF THE ACTION AND INTRODUCTION

1.    This is a suit for personal injury and financial damages arising out of a defective product and may be joined by the court with other class action lawsuits brought against Defendants Koninklijke Philips N.V. ("Royal Philips") Philips North America LLC (Philips NA), and Philips RS North America LLC ("Philips" or the "Defendants"), and is filed in the Western District of Pennsylvania, by Plaintiff on behalf of himself. a consumer, who purchased certain defective CPAP/BiPAP machines or ventilators manufactured, or distributed and sold by Defendants, placed for commercial trade.  Plaintiff alleges the following based on personal knowledge, information, investigations and belief.

2.    Philips manufactures, and sells, medical equipment products. These products include Continuous Positive Airway Pressure ("CPAP") and Bilevel Positive Airway Pressure ("BiPAP") machines, and ventilators which are used in the treatment of sleep apnea.

3.    Plaintiff was diagnosed with sleep apnea approximately on April 24, 2012 & was prescribed by his doctor, Dr. John Balmer, D.O. to us a continuous positive airway pressure machine more commonly known as CPAP.   Plaintiff purchased a Respironics BiFlex System model #750F, serial #PO5366316-631CPAP, in Erie PA at Apria Health Care, located at 4642 West 12th St., Suite 3, Erie, PA 16505.

4.    Plaintiff took possession of the above-described CPAP machine he purchased on or about April 25, 2012 and started using it immediately (that night). Plaintiff continued using Philip's CPAP machine every night thereafter, until he discovered that Phillips had publicly issued that certain CPAP machine, including the one Plaintiff purchased were defective.

5. ...    After confirming that Defendant's had recalled the machine including the one Plaintiff had purchased with the same model # & serial # as the recalled machines, Plaintiff stopped using said machine (some 5 years).

6.    On or about May 3, 2017, Plaintiff had been diagnosed with Lung cancer by Dr. Christopher J. Weibel, M.D. (address 765 Liberty St., Suite #311, Meadville, PA 16335) {ph. (814) 373- 2380}.  He had by this time been using the original model as set forth above in paragraph 3 for an extensive period of years.

7.    On June 14, 2021, Philips had announced a recall of many of its CPAP/BiPAP machines and its ventilators because many of these suffer from a common defect which can result in serious personal injury, permanent impairment, and be life-threatening.  Attached please find Exhibits A attached hereto and made part hereof.  Exhibit A enumerates the defects in certain of Defendant's products and in the particular product used by the Plaintiff and Phillip admitted

2

publicly that they could contain chemical carcinogenic compounds and gases which were being continuously introduced by air pressure directly into Plaintiff's lungs.

8.      These products contain polyester-based polyurethane ("PE-PUR") foam which is used to minimize the sound produced by the devices.   Philips acknowledges this PE-PUR foam can deteriorate over time, causing it to break down.  When the foam breaks down "it off gases" and omits small foam particles and gases which are inhaled or ingested through the use of the devices while assisting patients with respiration. When the foam breaks down it emit volatile organic compounds, which when inhaled, can result in serious adverse health effects, including causing cancer.

9.      Philips also disclosed that the absence of visible particles in the devices does not mean that PE-PUR Foam breakdown has not already begun.  Philips reported that lab analysis of the degraded foam reveals the presence of harmful chemicals, including: Toluene Diamine ("TDA"), Toluene Diisocyanate ("TDI"), and Diethylene Glycol ("DEG") that are all carcinogenic chemicals.

10.     Prior to issuing the Recall Notice, Philips received complaints regarding the presence of black debris/particles within the airpath circuit of its devices (extending from the device outlet, humidifier, tubing, and mask).  Philips also received reports of headaches, upper airway irritation, cough, chest pressure and sinus infection from users of these devices. Unfortunately for patients, Philips has known about these dangers for years but did nothing to warn patients or doctors until recently.

11.     In its Recall Notice, Philips disclosed that the potential risks of particulate exposure to users of these devices include: irritation (skin, eye, and respiratory tract),

inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic affects.

12.    On July 22, 2021, the Unites States Food and Drug Administration ("FDA" classified the subject recall as Class I, the most serious type of recall, which indicates that the use of the recalled devices may cause serious injuries or death.

13.    Plaintiff was prescribed, purchased and used on a daily basis, the defective Philips CPAP machine previously described as being recalled and being the type that he used extensively and was named by serial no., model, brand and named in said recall.

14.    As a direct and proximate result of Philip's wrongful conduct in researching, developing, designing, manufacturing, selling, distributing, and marketing the subject defective device and in failing to warn Plaintiff, consumers and the medical community regarding their latent and foreseeable risks.

15.    Plaintiff developed lung cancer, a sever and life-altering injury, causing him to undergo a surgical procedure and intravenous transfusion of cancer treating chemicals ("latruda") as well as, a total removal of all his limp nodes and glands and pathways on his left side of his body, as a direct cause of the Defendants wrongful conduct.

## II.    THE PARTIES

### A.    PLAINTIFF

16.    Paragraph 1 through 15 are incorporated under section II as though fully set forth herein.

17.    Plaintiff John Kight is a United States citizen and currently resides at 44951 Harrison Road, Spartanburg, Crawford County, Pennsylvania, 16434. He was for the past 25 years an independent contractor installing electrical apparatus in Pennsylvania but cannot now do such physical work.

4

18.     The Plaintiff received chest x-rays and was subject to other radiographic and other diagnostic procedures when black spots were observed located in his lungs along with cancer appearing spots appeared. He was treated at the Hillman Cancer Center, Shady side Hospital in Pittsburgh, Pennsylvania, where all his lymph nodes were removed on the left side of his body and under his left arm pit. He received transfusions and treatment of the drug "Latruda" which was infused into his blood system. Plaintiff has not been medically pronounced "cancer free" but remains alive at this time.

19.     On or about April 25, 2012, Plaintiff purchased a Respironics BiFlex System 1, model #750F, serial #PO5366316-631CPAP machine (BiFlex System 1) sold at Apria Healthcare currently located at 4642 West 12th Street, Ste. 2 and 3, Erie, Pennsylvania 16505.

20.     Plaintiff would not have purchased the device if he had known about the PE-PUR foam containing harmful chemicals as described in paragraph 9 and including the potential health hazards which caused his lung cancer and other illnesses.

21.     As a result of Defendant, Philips's unfair, deceptive, and/or fraudulent business practice of not informing the Plaintiff in a timely manner, and other users and owners of these devices, Plaintiff and they have suffered ascertainable loss, injury in fact, and otherwise have been harmed by Philips's conduct. Plaintiff in his case was "main lining" directly into his lungs polyurethane compounds known to be carcinogenic from April 25, 2012 until he learned of the defects in the CPAP device.

22.     Prior to learning about the defects, Plaintiff used his CPAP machine every night on the advice of his doctor for treatment of his Apnea.

23.     Upon finally learning of the problem, Plaintiff contacted Philips and confirmed that his CPAP machine was included in the recall.

24.    Plaintiff consulted with his doctor and has ordered a new machine, which cost was at approximately $1,020.00.

25.    Plaintiff would not have purchased the BiFlex System model #750F, serial #PO5366316-631CPAP machine if he had known it was defective. Plaintiff seeks a refund and reimbursement for the replacement, and all other appropriate damages associated with his injuries, ie., pain and suffering, lost earnings, exemplary and punitive damages associated costs and attorney fees.

26.    During the period which the Plaintiff used the Biflex System 1 system, he was diagnosed with and treated for lung cancer, Plaintiff was diagnosed with cancer in 2017 and underwent surgery and chemotherapy described above in paragraph 14..

27.    Plaintiff's lung cancer caused the Plaintiff substantial pain and suffering, mental anguish, loss of quality of life, lost wages/earnings and economic loss including but not limited to purchasing a new replacement medicine, medical products, cost for medical procedures, doctors' appointments, hospital and surgical charges in addition to extra economic expenses for travel to and from these treatments and procedures attorney fees and cost.

**B.    DEFENDANTS**

28.    Koninklijke Philips N.V. is a Dutch multinational company headquartered in Amsterdam, Netherlands, and is the parent company of Philips North America LLC and Philips RS North America LLC.

29.    Philips NV is a public limited liability company established under the laws of the Kingdom of the Netherlands, having its principal executive offices at Philips Center, Amstelplein 2, 1096 BC Amsterdam, Netherlands.

6

30.     Philips NV researches, develops, designs, manufactures, sells, distributes, and markets BiPAP/CPAP and ventilator devices, including the subject recalled device and other devices.

31.     Philips NV researched, developed, designed, manufactured, sold, distributed, and marketed the recalled devices, including the subject device purchased, owned and used by the Plaintiff.

32.     Philips NV is the parent company of Philips NA and Philips RS.

33.     Defendant Philips North America LLC (Philips NA) is a Delaware company with its principal place of business located at 222 Jacobs Street Cambridge, Massachusetts.

34.     Philips NA is a wholly-owned subsidiary of Philips NV.

35.     Upon information and belief, Philips NA manages the operations of Philips NV's line of business in North America, Including Philips RS.

36.     Defendant Philips RS North America LLC (Philips RS) is a Delaware corporation with a headquarters and a principal place of business 6501 Living Place, Pittsburgh, Pennsylvania 15206.  (Prior to December 2020, Philips RS was formerly Respironics, Inc. "Respironics")

37.     At all relevant times, each Defendant acted in all aspects as the agent and alter ego of each other, and reference to "Philips" or "Defendants" herein refers to each and every Defendant individually and collectively.

### III.     JURISDICTION AND VENUE

38.     Paragraph 1 through 37 are incorporated under section III as though fully set forth herein.

39.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states. This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

40.     Venue is proper because Philips RS North America LLC (formerly Respironics, Inc.) is headquartered in and regularly conducts business in Pennsylvania and this District and because a substantial part of the events or omissions giving rise to the claim of damages occurred in this District to the Plaintiff in this case, a Northwestern Pennsylvanian resident and other consumer located in this District.

## IV.     **FACTUAL ALLEGATIONS**

### A.     **CPAP AND BIPAP MACHINES AND VENTILATORS**

41.     Paragraph 1 through 40 are incorporated under section IV as though fully set forth herein.

42.     CPAP and BiPAP machines and ventilators are all used to treat serious respiratory conditions by helping patients to breathe.

43.     CPAP and BiPAP machines are used primarily as treatment for sleep apnea. A condition afflicting the Plaintiff.

44.     Sleep apnea (sometimes called obstructive sleep apnea) is a disorder in which breathing is disturbed temporarily during sleep. Breathing may stop or become very shallow. These periods are called "apneas," and they may be associated with fatigue, daytime sleepiness, depression, interrupted sleep, or snoring, among other symptoms. Serious cases can lead to

hypertension, heart attack, or stroke, among other medical ailments. It is estimated that over 25 million Americans suffer from sleep apnea.[1]

45.    CPAP therapy is the most common treatment for sleep apnea. In CPAP therapy, a machine delivers a flow of air through a mask over the nose or mouth, which increases air pressure in the throat so that the airway does not collapse during inhalation. CPAP therapy assists breathing during sleep and can successfully treat sleep apnea. According to the Mayo Clinic, "CPAP is the most consistently successful and most commonly used method of treating obstructive sleep apnea."

46.    BiPAP machines and Automatic Positive Airway Pressure (APAP) machines are similar devices that also treat sleep apnea. BiPAP machines use two different pressures, one for inhaling and one for exhaling. APAP machines adjust pressure automatically during the night as needed.

47.    CPAP, BiPAP and APAP machines all consist of a main unit which connects to a facemask via an air hose. A patient will typically place the main unit on a nightstand and then wear the mask in bed while sleeping.

48.    Sleep apnea patients typically use these machines every night when they sleep. Symptoms may return quickly without continued use.

---

[1] *See* The American Academy of Sleep Medicine, *Rising prevalence of sleep apnea in U.S. threatens public health*, available at https://aasm.org/rising-prevalence-of-sleep-apnea-in-u-sthreatens-public-health/ (last visited July 3, 2021).

**B.    PHILIPS PRODUCTS**

49.    CPAP and BiPAP machines and ventilators are big business. The global sleep apnea devices market size was valued at $3.7 billion in 2020 and is expected to expand considerably in the coming years.[2]

50.    Philips is a major manufacturer of CPAP machines, BiPAP machines, and ventilators. Philips has sold millions of CPAP and BiPAP machines and ventilators in the United States.

51.    Philips sold/sells its products through its Western Pennsylvania based subsidiary, Respironics (now Philips RS North America LLC), which Philips acquired in 2008 which is the brand that Plaintiff purchased in Erie, Pennsylvania.

52.    Many of Philips's CPAP and BiPAP machines and ventilators contain PE-PUR foam in order to reduce sound made by the machine. As designed, air passes through this foam before it is pumped into the patient's airway. Some of the sound generated by the machine is then absorbed by the foam.

53.    Sound reduction can be an attractive feature since patients operate these devices while they (and their partners) are sleeping. In fact, the relative quiet of BiFlex System 1 products factors prominently into Philips's marketing.[3]

54.    On April 13, 2021, Philips announced that it was launching a next-generation model of the BiFlex System 1, called the BiFlex System 1 2.

---

[2] *See* https://www.grandviewresearch.com/industry-analysis/sleep-apnea-devices-market (last visited July 3, 2021).
[3]                                                                                                                                          *See*
https://www.documents.philips.com/assets/20170523/62e4f43a1349489ba3cca77c0169c6ef.p df (last visited July 3, 2021).

## C.    RECALL AND SERIOUS HEALTH RISKS

55.    On April 26, 2021, less than two weeks after it announced the launch of the second generation, Philips announced the recall of first-generation BiFlex System 1 products due to concerns about serious health risks.

> Philips has determined from user reports and testing that these are possible risks to users related to the sound abatement foam used in certain of Philips' sleep and respiratory care devices currently in use. The risks include that the foam may degrade under certain circumstances, influenced by factors including use of unapproved cleaning methods, such as ozone*), and certain environmental conditions involving high humidity and temperature. The majority of the affected devices are in the first-generation BiFlex System 1 product family.

56.    On June 14, 2021, Philips issued a further statement about the possible health risks stemming from deterioration of the PE-PUR foam:

> To date, Philips has produced millions of Bi-Level PAP, CPAP and mechanical ventilator devices using the PE-PUR sound abatement foam. Despite a low complaint rate (0.03% in 2020), Philips determined based on testing that there are possible risks to users related to this type of foam. The risks include that the PEPUR foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user, and the foam may off-gas certain chemicals. The foam degradation may be exacerbated by use of unapproved cleaning methods, such as ozone, ** and high heat and high humidity environments may also contribute to foam degradation.

57.    Plaintiff's BiFlex System contains a reservoir for water which water was heated in the machine for creating humidity.  The air was pumped through the machine to the user after passing over and across urethane coating used to reduce noise and vibration.

58.    Philips further has explained that it "has received reports of possible patient impact due to foam degradation. The potential risks of particulate exposure include headache, irritation, inflammation, respiratory issues, and possible toxic and carcinogenic effects. The potential risks

of chemical exposure due to off-gassing include headache, irritation, hypersensitivity, nausea/vomiting, and possible toxic and carcinogenic effects."

59.    On the same day, Philips also issued "Clinical information for physicians," which explained that the foam breakdown "may lead to patient harm and impact clinical care." Philips warned doctors that the following symptoms and health effects can result:

> While these have been limited reports of headache, upper airway irritation, cough, chest pressure and sinus infection that may have been associated with the foam, based on lab testing and evaluations, it may be possible that these potential health risks could result in a wide range of potential patient impact, from transient potential injuries, symptoms and complications, as well as possibly serious injury which can be life-threatening or cause permanent impairment, or require medical intervention to preclude permanent impairment.

60.    Deterioration of the foam releases harmful chemicals into the air that the defective machines are pumping into patients' lungs, including toluene diamine, toluene diisocyanate, and diethylene glycol.

61.    The National Institute for Occupational Safety and Health categorizes toluene diisocyanate as "potential carcinogen." The European Union considers toluene diisocyanate "highly toxic" and has concluded that toluene diamine "cannot be considered safe for use."

62.    Philips admitted that it "has received several complaints regarding the presence of black debris/particles PE-PUR foam chemicals within the airpath circuit (extending from the device outlet, humidifier, tubing, and mask)." The PE-PUR foam is black, and when it breaks down, it releases these particles into the airpath which contain dimethyl diazine and Phenol, 2, 6-bis (1, 1-dimethylethyl)-4-(1-methylpropyl).

63.    Harmful gases can also be released as the foam degrades, including dimethyl diazine and Phenol, 2, 6-bis (1, 1-dimethylethyl)-4-(1-methylpropyl).

64.    Philips admitted that these harmful substances can cause: "irritation and airway inflammation, and this may be particularly important for patients with underlying lung diseases

12

or reduced cardiopulmonary reserve" and may lead to the following symptoms: "headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/ vomiting, toxic and <u>carcinogenic effects</u>," as well as "adverse effects to organs such as kidney and liver."

65.    Philips advised patients to stop using affected CPAP and BiPAP machines immediately because of the potential health risks.

66.    The statement also acknowledged that it may be too dangerous for patients using affected ventilators to stop using them and more or less advised doctors to decide whether it was more dangerous to take the patient off the ventilator or to leave the patient on the defective ventilator.

67.    The products affected by the recall include ("Recalled Products"):

- E30
- BiFlex System 1 ASV
- BiFlex System 1 ST, AVAPS
- SystemOne ASV4
- C Series ASV, S/T, AVAPs
- OmniLab Advanced Plus
- SystemOne (Q Series)
- BiFlex System 1 CPAP, Auto CPAP, BiPAP
- BiFlex System 1 Go CPAP, APAP
- Dorma 400, 500 CPAP
- REMStar SE Auto CPAP
- Trilogy 100 and 200
- Garbin Plus, Aeris, LifeVent
- A-Series BiPAP Hybrid A30
- A-Series BiPAP V30 Auto
- A-Series BiPAP A40
- A-Series BiPAP A30

68.    Since 2009, Philips has incorporated PE-Pur form in PAP, CPAP devices and ventilators, including the subject device for sound and ventilation abatement purposes.

69.    Philips has admitted that the recalled products are defective and unsafe and that patients should stop using them immediately. Although still within what was supposed to be their useful life, these products are now effectively useless.

70.    Had Plaintiff and Class Members known about the defect and health risks, they either would not have bought these products or would have paid significantly less for them. Plaintiff and Class Members have all suffered economic injuries as a result of their purchase of Philips CPAP and BiPAP machines and ventilators.

### D.    PHILIPS KNEW ABOUT THE DEFECT LONG BEFORE ISSUING THE RECALL

71.    Although Philips did not disclose these health risks to its consumers or the general public until 2021, Philips knew about these health risks much earlier.

72.    As noted above, when Philips announced the recall, it acknowledged it had already received complaints about black particles in the airways of the machines. The BiFlex System 1 line first launched in 2015, and several of the affected models such as the one utilized by the Plaintiff have been on the market longer.

73.    Online message boards, review sites, and social media contain many complaints regarding black particles and foam degradation problems. Philips, like most companies, likely monitors these online forums and would have learned about the problem years ago.

14

74.     For example, Nick Dunn, who runs the YouTube channel "CPAP Reviews," reported as soon as the recall was announced that he had known about the foam issues for several years because he monitors message boards and social media about CPAP machines.

75.     The following are just a sampling of the online complaints.

76.     In 2018, the user "trickyneedsleep" reported on apneaboard.com that, using the BiFlex System 1 Auto, the filters turned black within three days of use.

77.     In 2019, the user "WHenry" reported on apneaboard.com in a thread entitled "BiFlex System 1 Filter Contamination" that "both the pollen and ultra-fine filters in my machine were clogged with black (Carbon?) particles. I also noted that water chamber was completely dry. Thise were odd odors noted, and the water chamber was undamaged." He explained that he had recently cleaned the filters and that "[t]here was only a small amount of dust on the furniture, and the machine and tubing is clean. I do not burn candles nearby, and the furnace is off. I do have the window slightly opened, as is the case nearly year-round." He asked: "Is it possible the contamination is from the blower?"

78.     In 2019, the user "Skogcat1" reported on apneaboard.com in a thread entitled "Black sticky dust in CPAP machine" that, when using the REMStar Auto, there were "sticky black dust particles" in the humidifier chamber.

79.     In September 2020, Carol Nickerson posted on Facebook that he found a black mold-like substance in the water reservoir of his Philips BiFlex System 1.

80.     In June 2021, shortly after the recall was announced, on a Reddit thread entitled "BiFlex System 1 Foam, user "BOSSHOG999" posted: "I was wondering what the hell those black particles were in my tube."

81.    In addition to consumer complaints, Philip should have known about the foam problems from its prerelease testing. Medical devices go through considerable testing and design prior to release to the public.

82.    As noted above, Philips's own marketing dating back to at least 2017, indicates it considered and studied the foam and noise reducing abilities extensively when designing the product.[4]

83.    Furthermore, Philips already claims to know that the second-generation BiFlex System 1 2, which it launched just before the recall, is free from the foam degradation defect. This strongly suggests that Philips was aware of and looked at the issue when developing the BiFlex System 1 2.

84.    Despite knowing about the foam deterioration defect and related health hazards for years, Philips did nothing to warn consumers, healthcare providers, or the public until very recently.

85.    Furthermore, although it has issued a "recall" of the affected products, Philips is not actually repairing or replacing them. Philips has indicated it may take over a year before it can start repairing or replacing consumers' devices. Instead, Philips is using this as an opportunity to encourage consumers to buy its second-generation products (at full price).

86.    Unfortunately for patients who need to use these devices every day to stave off serious health problems, waiting over a year for Philips to offer some sort of repair is not a realistic option.

---

[4]                                                                                                                          *See*
https://www.documents.philips.com/assets/20170523/62e4f43a1349489ba3cca77c0169c6ef.p
df (last visited July 3, 2021).

## V.    EQUITABLE TOLLING OF STATUTES OF LIMITATIONS

87.    Paragraph 1 through 86 are incorporated under section V as though fully set forth herein.

88.    The running of any statute of limitations has been equitably tolled by reason of Defendants' fraudulent concealment and/or omissions of critical safety information. Through its affirmative misrepresentations and omissions, Philips actively concealed from Plaintiff and Class Members the true risks associated with the Recalled Products.

89.    As a result of Defendants' actions, Plaintiff was unaware, and could not have reasonably known or learned through reasonable diligence, that he had been exposed to the risks and harms set forth herein and that those risks and harms were the direct and proximate result of Defendants' acts and omissions.

90.    The Plaintiff's claims are timely filed and maybe tolled under American Pipe & Construction Co. v. Utah 414 U.S. 538 (1974); there the Court unanimously held that a plaintiff's timely filing of an ultimately unsuccessful class action tolled the statute of limitation "for all purported members of the class who make timely motions to intervene after the court found the suit inappropriate for class action status." Id. At 553.

## VI.    CLASS ALLEGATIONS

91.    Paragraph 1 through 90 are incorporated under section VI as though fully set forth herein.

92.    This action is brought, and may properly proceed, as a class action, pursuant to Rule 23(a) and 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiff seeks certification of a Class defined as follows ("Nationwide Class"):

> **Nationwide Class:** All persons in the United States who have purchased a Recalled Product other than for resale.

17

93.    Excluded from the Class is Philips, its affiliates, employees, officers and directors, and the Judge(s) assigned to this case.  Plaintiffs reserve the right to modify, change, or expand the class definitions if discovery and/or furthers investigation reveal that they should be expanded or otherwise modified.

94.    The rights of each member of the Class were violated in a similar fashion based upon Defendants' uniform actions and meet the requirements for a class action under Rule 23:

a.    **Numerosity**: Members of the Class are so numerous that their individual joinder is impracticable. Plaintiff is informed and believes that the proposed Class contains at least millions of individuals. The Class is therefore sufficiently numerous to make joinder impracticable, if not impossible. The precise number of Class members is unknown to Plaintiff at this time, but the Class members are readily ascertainable and can be identified by Defendants' records.

b.    **Existence and Predominance of Commons Questions of Fact and Law**: Common questions of law and fact exist as to all members of the Class. These questions predominate over any questions affecting only individual Class members. These common legal and factual questions include, without limitation:

i.    Whether the Recalled Products fail under the implied warranty of usability;

ii.    Whether Defendants were unjustly enriched by the sale of Recalled Products;

iii.    Whether Defendants were negligent in selling the Recalled Products;

iv.    Whether Defendants failed to warn consumers regarding the risks of the Recalled Products;

18

v.      Whether Defendants' practices constitute unfair or deceptive acts or practices under state consumer protection statutes;

vi.     The appropriate nature of class-wide equitable relief; and

vii.    The appropriate measurement of restitution and/or measure of damages to Plaintiff and members of the Class.

These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Class.

a       **Typicality**: Plaintiff's specific claims of injury, are typical in nature of the claims of all members of the Class who purchased the Recalled Products for personal use.

b       **Adequacy**: Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class that he seeks to be included and become a part thereof; he has retained counsel.

c       **Superiority**: A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiff and the Class. The injury suffered by each Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the Class to individually and effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation also increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Therefore, Plaintiff does not object to being joined.

## VII.    CAUSES OF ACTION

### COUNT I.

### BREACH OF THE IMPLIED WARRANTY OF USABILTIY

91. Plaintiff and the Class incorporate by reference all preceding paragraphs.

92. By operation of law, Defendants, as manufacturers of the Recalled Products and as the providers of a limited warranty for the Recalled Products, impliedly warranted to Plaintiff and the Class that the Recalled Products were usable for their ordinary and intended use.

93. Defendants breached the implied warranty of usability in connection with the sale and distribution of the Recalled Products. At the point of sale, the Recalled Products while appearing normal contained defects as set forth here in rendering them unusable.

94. Defendants, their agents and their employees knew or should have known that the Recalled Products suffer from a defect that causes negative health effects and/or places persons at risk for negative health effects to such an extent that the products are unusable.

95. Defendants' recall announcement instructs Class Members to not use Recalled Products because of the health risks. This renders the products unusable and thus worthless.

96. Defendants have refused to provide appropriate warranty relief notwithstanding the risks of using the Recalled Products. Plaintiff and the Class reasonably expected, at the time of purchase, that the Recalled Products were usable for their ordinary and intended use.

97. Had Plaintiff and Class Members known they would not be able to use their Recalled Products, they would not have purchased them or would have paid significantly less for them.

98. As a direct and proximate result of Defendants' breach of the implied warranty of usability, Plaintiff and the Class have sustained damages in an amount to be determined at trial.

## COUNT II
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

99. Plaintiff and the Class incorporate by reference all preceding paragraphs.

100.    By operation of law, Defendants, as manufacturers of the Recalled Products and as the providers of a limited warranty for the Recalled Products, impliedly warranted to Plaintiff and the Class that the Recalled Products were of merchantable quality and safe for their ordinary and intended use.

101.    Defendants breached the implied warranty of merchantability in connection with the sale and distribution of the Recalled Products. At the point of sale, the Recalled Products while appearing normal contained defects as set forth herein rendering them unsuitable and unsafe for personal use.

102.    Had Plaintiff and the Class known the Recalled Products were unsafe for use, they would not have purchased them.

103.    Defendants have refused to provide appropriate warranty relief notwithstanding the risks of using the Recalled Products. Plaintiff and the Class reasonably expected, at the time of purchase, that the Recalled Products were safe for their ordinary and intended use.

104.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and the Class have sustained damages in an amount to be determined at trial.

## COUNT III
## BREACH OF EXPRESS WARRANTY

105.    Plaintiff and the Class incorporate by reference all preceding paragraphs.

106.    Defendants warranted the Recalled Products "shall be free from defects of workmanship and materials and will perform in accordance with the product specifications for a period of two (2) years from the date of sale."

107.    Defendants breached this express warranty in connection with the sale and distribution of Recalled Products. At the point of sale, the Recalled Products while appearing normal—contained immediate defects as set forth herein, rendering them unsuitable and unsafe for personal use.

108.    Had Plaintiff and the Class known the Recalled Products were unsafe for use, they would not have purchased them.

109.    Defendants have breached their warranty and refused to provide appropriate warranty relief notwithstanding the risks of using the Recalled Products. Plaintiff and the Class reasonably expected, at the time of purchase, that the Recalled Products were safe for their ordinary and intended use.

110.    As a direct and proximate result of Defendants' breach of their express warranty, Plaintiff and the Class have sustained damages in an amount to be determined at trial.

## COUNT IV
## STRICT LIABILITY-FAILURE TO WARN

111.    Plaintiff and the Class incorporate by reference all preceding paragraphs.

112.    Defendants had a duty to warn Plaintiff and the Class members regarding the defect and true risks associated with the Recalled Products.

113.    Defendants failed to provide adequate warnings regarding the risks of the PE-PUR foam.

114.     Defendants had information regarding the true risks but failed to warn Plaintiff, Class members, and their physicians to strengthen their warnings.

115.     Despite Defendants' obligation to unilaterally strengthen the warnings, Philips instead chose to actively conceal this knowledge.

116.     Plaintiff and Class Members would not have purchased, chosen, and/or paid for all or part of the Recalled Products had they known the defect and risks of purchasing the product.

117.     This defect proximately caused Plaintiff's and Class members' injuries which include economic injuries, as well as headache, irritation, inflammation, respiratory issues, and exposure to materials with toxic and carcinogenic effects.

118.     Plaintiff and the Class suffered damages in an amount to be determined at trial.


## COUNT V
## DESIGN DEFECT STRICT LIABILITY

119.     Plaintiff and the Class incorporate by reference all preceding paragraphs.

120.     The design of the Recalled Products, including but not limited to design and use of the foam and the placement of the foam within the Recalled Product, was defective and unreasonably dangerous, causing degradation and inhalation of the foam, which may cause headaches, irritation, inflammation, respiratory issues, and exposure to materials with toxic and carcinogenic effects.

121.     The design of the Recalled Products and the foam rendered the Recalled Products not reasonably fit, suitable, or safe for their intended purpose.

122.     The dangers of the Recalled Products outweighed the benefits and rendered the products unreasonably dangerous. Indeed, there are other CPAP and other machines that

do not use a similarly toxic foam that is subject to degradation, inhalation, and ingestions, such as Defendants' next-generation BiFlex System 1 machines.

123.    Safer, alternative machines from other manufactures were available that did not suffer from the defects as set forth other and did not have an unreasonable risk of harm as with the Recalled Products and their unsafe foam.

124.    The risk benefit profile of the Recalled Products was unreasonable, and the products

should have had stronger and clearer warnings or should not have been sold in the market.

125.    The Recalled Products did not perform as an ordinary consumer would expect.

126.    Plaintiff and the Class suffered damages in an amount to be determined at trial.


## COUNT VI
## NEGLIGENT FAILURE TO WARN

127.    Plaintiff and the Class incorporate by reference all preceding paragraphs.

128.    Defendants owed Plaintiff and Class Members a duty of care and to warn of any risks associated with the Recalled Products. Defendants knew or should have known of the true risks but failed to warn Plaintiff, Class members, and their doctors.

129.    Defendants' negligent breach of duty caused Plaintiff and Class members economic damages and injuries in the form of headache, irritation, inflammation, respiratory issues, and exposure to materials with toxic and carcinogenic effects

130.    Plaintiff and Class members would not have purchased, chosen, and/or paid for all or part of the Recalled Products had they known that the risks associated with purchasing the product.

131.    Plaintiff and the Class suffered damages in an amount to be determined at trial.

## COUNT VII
## NEGLIGENT DESIGN DEFECT

132.     Plaintiff and the Class incorporate by reference all preceding paragraphs.

133.     Defendants negligently designed the Recalled Products. Philips owed Plaintiff a duty to design the Recalled Products in a reasonable manner. The design of the Recalled Products, including but not limited to design of the foam and the placement of the foam within the Recalled Product, was defective and unreasonably dangerous, causing degradation and inhalation of the foam, and causing headaches, irritation, inflammation, respiratory issues, and exposure to materials with toxic and carcinogenic effects.

134.     The design of the Recalled Products and the foam rendered the Recalled Products not reasonably fit, suitable, or safe for their intended purpose.

135.     The dangers of the Recalled Products outweighed the benefits and rendered the products unreasonably dangerous.  Indeed, there are other CPAP and other machines that do not use a similarly toxic foam that is subject to degradation, inhalation, and ingestions, such as Defendants' next-generation BiFlex System 1 machines.

136.     Safer, alternative machines from other manufactures were available which did not have an unreasonable risk of harm as with the Recalled Products and their unsafe foam.

137.     The risk benefit profile of the Recalled Products was unreasonable, and the products should have had stronger and clearer warnings or should not have been sold in the market.

138.     The Recalled Products did not perform as an ordinary consumer would expect.

139.     Plaintiff and the Class suffered damages in an amount to be determined at trial.

## COUNT VIII
## NEGLIGENT RECALL

140.     Plaintiff and the Class incorporate by reference all preceding paragraphs.

141.     In issuing a voluntary recall, Philips assumed duties to Plaintiff and the Class to exercise reasonable care in issuing and implementing the recall.

142.     Philips breached its duties by failing to adequately warn Plaintiff and the Class of the dangers associated with the use of the Recalled Products by refusing to promptly repair or replace the Recalled Products.

143.     As a direct result of Defendants' breach of duty, Plaintiff and the Class have suffered harm in an amount to be determined at trial.

## COUNT X
## UNJUST ENRICHMENT
## In the Alternative

144.     Plaintiff and the Class incorporate by reference all preceding paragraphs.

145.     Plaintiff and the Class members conferred a tangible and material economic benefit upon Defendants by purchasing the Recalled Products. Plaintiff and Class members would not have purchased, chosen and/or paid for all or part of Recalled Products had they known that they the true risks of using the Recalled Products while Defendants cannot provide a timely repair or replacement for the Recalled Products. Under these circumstances, it would be unjust and inequitable for Defendants to retain the economic benefits they received at the expense of Plaintiff and the Class.

146.     Failing to require Defendants to provide remuneration under these circumstances would result in Defendants being unjustly enriched at the expense of Plaintiff and the Class members who endure being exposed to the risk of developing serious medical conditions and can no longer use their machines safely.

147.    Defendants' retention of the benefit conferred upon them by Plaintiff and the Class would be unjust and inequitable.

148.    Plaintiff and the Class suffered damages in an amount to be determined at trial.

149.    The Plaintiff avers that the Defendant's aforementioned conduct is the cause of his lung cancer which resulted in physical pain and suffering, mental anguish and feelings of distress and Plaintiff request the court to award him damages for his physical and mental conditions along with punitive and exemplary damages as the Court of Jury may grant along with all his cost, and attorney fees.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests damages in excess of the sum of 1,000,000, individually and on behalf of the Class, that this Court:

A.    determine that the claims alleged herein may be maintained as a class action under Rule 23(a), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure on behalf of the Nationwide Class and State Class defined above, and designate Plaintiff a class representative;

B.    Order this case to be joined in to other cases against said defendant that are designated as "class action" lawsuit for the damages enumerated in this complaint and below;

C.    award equitable and injunctive relief, including but not limited to, requiring Defendants to institute a medical monitoring program for Class members, restitution, and disgorgement of profits;

27

D.     award all actual, general, special, incidental, exemplary, punitive, and consequential damages to which Plaintiff and Class members are entitled;

E.     award pre-judgment and post-judgment interest on such monetary relief;

F.     award reasonable attorneys' fees and costs; and

G.     grant such further and other relief that this Court deems appropriate.

**JURY DEMAND**

Plaintiff and the Class demand a trial by jury on all issues so triable.

Dated: February 8, 2024

Respectfully Submitted,

George M. Schroeck, Esq.
PA Attorney ID# 15894
117 West Seventh Street
Erie, Pennsylvania 16501
Phone: (814) 459-8655
Fax: (814) 452-3602
Email: schroecklaw@verizon.net

*Attorney for Plaintiff, John Kight*

Felicia R. Schroeck
PA Atty ID# 74583

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOHN KIGHT                                          :
      Plaintiff                               :    **Civil Action:**
                                   :
    V.                                              :
                                   :
KONINKLIJKE PHILIPS, N.V.  PHILIPS               :
NORTH AMERICAN, LLC AND PHILIPS                  :
RS NORTH AMERICAN LLC.,                           :
      Defendant                              :

### Certification and Closing Under Federal Rule of Civil Procedure 11

By signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11. A.

If at any time during the litigation process, I proceed with this case pro se (without an attorney representing me), I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Dated: _12-2-23_

John H. Kight

John Kight, Plaintiff

27